## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 91 C 3316 | **DATE** | 8/30/2001 |
| **CASE TITLE** | HENRY HORNER MOTHER'S GUILD vs. CHICAGO HOUSING AUTHORITY, ET AL | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  **Motion (284-1, 284-2, 284-3) to implement is denied. Motion (282-, 282-2) for contempt and injunctive relief is denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| ✓ | Notified counsel by telephone. | | AUG 3 1 2001 date docketed | |
| ✓ | Docketing to mail notices. | | | 299 |
| | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 01 AUG 30 PM 3: 10 | | |
| DW | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

HENRY HORNER MOTHERS GUILD, et al.,

    Plaintiffs,

v.

THE CHICAGO HOUSING AUTHORITY (CHA), et al.,

    Defendants.

No. 91 C 3316
Judge James B. Zagel

**DOCKETED**

**AUG 3 1 2001**

## MEMORANDUM OPINION AND ORDER

An amended consent decree governs the relationship between the parties in this case and I am charged with refereeing disputes, armed with the contempt powers of this Court. The current round of motion practice presents a grim picture of the deteriorated[1] relationship between the plaintiffs (a class of residents in the Henry Horner redevelopment project) and the new management company hired to oversee the neighborhood, PM One. The plaintiffs ask me to hold PM One and CHA in contempt, and the defendants ask me to implement various management policies without the plaintiffs' approval. The specific disputes are less significant to me than the vitriolic tone of argument, and I urge the parties to step back from this precipice – the consequences of an "us versus them" attitude are unlikely to be good for anyone in this case.

PM One is a relatively new player to this decree. The plaintiffs did not want it to get the contract to manage the development, but I sided with the defendants and allowed CHA to contract with PM One. See Order of June 9, 2000. During that dispute, the relationship between the Horner Residents Committee (HRC) and CHA seemed fractured, but not irreparable. I had hoped that the

---

[1] This assumes a relationship was ever established, an assumption that, given the language of the briefs, is doubtful.

HRC and PM One would be able to work together, but it appears they have not gotten off on a good foot. I suppose things could be much worse, and I continue to believe that a positive working relationship can be forged. In order for this to happen, however, it is clear that PM One needs to make some adjustments.

PM One should understand, first, that it is within the contempt power. The decree defines the CHA (the party to the decree) to include its agents; PM One is well aware of the decree (it consented to be bound by the decree in its contract with CHA); the development manager is specifically referenced in the decree; and, finally, I previously ordered all CHA agents and persons acting in concert with the defendants to abide by and implement the decree. If I find that PM One has violated the terms of the decree, I will sanction it.

Paragraph 16 of the Amended Consent Decree provides: "The CHA defendants and the development manager shall consult and attempt to agree with the plaintiffs... regarding implementation of the Horner Revitalization Program and this Amended Consent Decree, including determining the location, design, configuration and bedroom size of the newly constructed or acquired units, in determining the identity of the entities who will develop and manage the revitalized Horner development, *and in determining management and security policies.*" Plaintiffs say that the manager, PM One, and CHA have cut them out of the loop by making unilateral decisions first, asking for approval later. Communication and consultation are not what they were under the previous manager. In fact, plaintiffs say that Dalphine Allen-Jasper, PM One's on-site property manager, has been "downright rude" to plaintiffs' counsel, and the quality and kind of information being given by the manager are significantly worse than the HRC wants. Defendants say they have no generalized duty to communicate to plaintiffs and that their "only obligation under paragraph 16 is to consult with the HRC." Elsewhere, defendants note that hypothetical problems between CHA and PM One are "none of the plaintiffs' business." This

2

sentiment is not helpful. In general, it does not bode well that plaintiffs have found improved cooperation from CHA and PM One only after a motion for contempt had been filed. It would seem that defendants could have avoided the public mud-slinging if they had cooperated with plaintiffs earlier.

Paragraph 16 requires more than post hoc notice of changes in management policies. It requires consultation and an attempt to agree, before implementation.

That said, the HRC must also realize that here the past might be merely prologue, it is not the final word. The fact that the previous manager did things differently does not mean that PM One is now in contempt. In fact, PM One's substantive management decisions do not seem inappropriate at all. And, the manner in which consultation occurs does not have to be the same as before. Finally, I note that even if the HRC has a personal distaste for PM One and its employees, organized obstruction of management (Jasper believes plaintiffs are organizing a rebellion against her firm) is not going to solve the problem, which is ineffective communication. Withholding consent for the wrong reasons can itself be a violation of the decree, and I assume the plaintiffs know that negotiation does not mean always getting your way. I emphasize that PM One is entitled to exercise its professional judgment on management policies, and plaintiffs ought to give PM One a chance to prove itself.

The failure to communicate, that is, the failure to consult and attempt to agree on management policies is a violation of paragraph 16 and is punishable by contempt. So, both sides to this dispute are subject to orders, disobedience of which may subject them to contempt sanctions. If contempt has occurred and a finding to that effect is what it takes to get these two sides to sit down and talk to each other, I will not hesitate to enter such a finding, despite my general reluctance to use the blunderbuss of contempt even where it is legally justified. Plaintiffs raise nine areas of management policy on which they accuse CHA and PM One of failing to negotiate under paragraph 16, and I address each in turn.

1.  **Tenant Assignment Process**

In the past, the plaintiffs had a close working relationship with the management company, and, pursuant to a Memorandum of Agreement (MOA) with CHA, were well-informed on tenant assignment matters. Plaintiffs' counsel is used to being in a position to know where his clients are assigned, when they are supposed to move in, and how to handle assignment problems expeditiously. Today, PM One does not follow the MOA, does not keep counsel informed about assignments, and when a problem does occur, it fails to consult counsel (who would probably be in a position quickly to address the issue).

Defendants respond by arguing that the MOA is not part of the decree, so a violation of it is not punishable by contempt. Plaintiffs' point, however, is different. The MOA is an agreement entered into pursuant to paragraph 16; it represents a management policy and if it is going to be changed (or ignored), PM One had best talk to the plaintiffs about it. In general, the process works best if PM One provides sufficient documentation on tenant assignments so that, at the very least, plaintiffs know whether they have objections.

Plaintiffs primarily cite the example of Horner resident Shirley Winfrey. She was assigned a unit, but someone else was given it. Months of emails and somewhat inconsistent positions from PM One followed until she was given an alternative unit. Defendants blame Winfrey for failing to recertify, Winfrey says she never received notice of the need to recertify, and it seems it took quite a bit of effort from plaintiffs' counsel to get the situation sorted out. Defendants say that if this isolated incident is the worst case plaintiffs have, then things are actually going well. In some respects, I agree. Things could indeed be worse, but perhaps defendants should raise the bar of expectations a little higher. The bigger problem is that if plaintiffs' counsel feel that CHA and PM One are unresponsive to inquiries, slow to respond, and then intransigent, their credibility is shot as far as plaintiffs are concerned. It seems clear that plaintiffs don't believe a word uttered by PM One, and this will continue unless and

4

until PM One timely provides the documentation to back up its statements and decisions. According to plaintiffs' counsel, if there were a problem with a tenant's need to recertify, a simple phone call to counsel could have avoided all the trouble. PM One's unilateral decision to reassign the tenant, without consultation, fanned the flames of discontent for no good purpose.

PM One and CHA must consult plaintiffs and attempt to agree on a procedure for handling tenant assignments. It may be that the MOA and Horner Occupancy Standards provide the quickest and easiest procedure, and PM One should agree to those principles. However, I do not believe it necessary for me to dictate terms, yet. I leave it to the parties to negotiate an amenable procedure to prevent incidents like Winfrey's from happening again.

2.   Termination of Tenancy Notices

Plaintiffs complain that CHA and PM One no longer adhere to the Horner Occupancy Standards which require them to provide plaintiffs with copies of Notices of Termination served upon any Horner tenant for any reason other than nonpayment of rent. Defendants say they provide a monthly print-out summary which should suffice. Plaintiffs say the print-out summary does not convey the same amount of information as the actual Notices. I see no reason why the Notices cannot be provided, and this seems to be a dispute that required defendant to incur almost no cost to satisfy plaintiffs' request. However, since it now appears that defendant is providing the Notices (plaintiffs say they have been receiving them since they filed the contempt motion), I think this particular dispute is moot. I do note, however, that like the other issues raised in the motion, the real problem is not the substance of the complaint, but the conflict (perhaps of personality) created in the communication (or lack thereof) between the parties. For example, Jasper says she has faxed the Notices, plaintiffs say this is false and note the absence of fax logs to corroborate Jasper's affidavit.

5

3.  **Section 8 Relocations**

Next, plaintiffs accuse PM One and CHA of obstructing the Section 8 process, a process which I agree is an important element of implementing the redevelopment plan of the decree. Plaintiffs allege a systemic problem at PM One. It fails to certify families as lease-compliant, fails to provide the relocation counseling agency with information on referred families, fails to update the Community and Supportive Services database, and in general fails to communicate and cooperate with the necessary parties. But, plaintiffs note, PM One has become more cooperative since the filing of the motion.

Defendants say these sweeping claims are evidenced by one isolated incident, the experience of Yolanda Gentry, and do not justify a finding of contempt. I am troubled by plaintiffs' allegations that Jasper was "downright rude" when it came to signing the necessary documents for Gentry and that PM One presented a moving target of proffered justifications for its delay. Gentry lost the apartment she wanted and was forced to start over again. I see no benefit to delaying the processing of Section 8 relocations, and it seems to me that PM One is missing a valuable opportunity to work with plaintiffs on a mutually beneficial task, one that should not be afflicted by the rancor of their other disputes.

So far, the plaintiffs' grievances consist of a general failure to communicate and cooperate with counsel. I am inclined to agree that PM One and CHA must do more to involve plaintiffs in these significant decisions concerning Horner, but I do not believe defendants' actions justify, yet, a contempt sanction. This is largely because I believe it is still relatively early in PM One and plaintiffs' relationship, and there is room for progress to be made before I am forced to pick sides on particular issues. I am fairly sure PM One does not actually believe it has carte blanche to run the neighborhood to the exclusion of plaintiffs, and it should go to some lengths to ensure that it does not create that impression.

### 4. 50-80% Area Medium Income Tenant Selection Process

The Tenant Selection Committee screens and selects 50-80% area medium income families for certain reserved units at Horner. The TSC is made up of three HRC appointees and three CHA appointees. The TSC meets to review files of prospective tenants and conduct face-to-face interviews. Defendants have been attempting for several months to convene a meeting of the TSC to screen three prospective tenants. The HRC representatives have refused to attend these meetings. In the past, tenants have been placed in order of the date of their approval by the TSC. It appears that now CHA and PM One want to place tenants in order from the date they first applied, and the three families at issue have earlier application dates than the other families on the waiting list. Plaintiffs refuse to meet because they believe that defendants are skipping over families; defendants say it is a reasonable management decision to go by application date.

While defendants accuse plaintiffs of boycotting the TSC, paralyzing it without a quorum, the correspondence suggests that plaintiffs repeatedly asked for an answer to the question, "why are your proceeding this way?" and never got an answer. Plaintiffs decided not to meet until their questions were answered. Defendants argue that plaintiffs have no reason to believe that "skipping over" is occurring, but this does not quite respond to plaintiffs real complaint, which is that they ask for documents or for an explanation and are met with intransigence. I have no issue with the substance of CHA and PM One's decision to sort tenants by application date, but I agree with plaintiffs that they should have been consulted and asked to agree to such a procedure. A constructive dialog cannot occur if defendants refuse to produce documents to the plaintiffs (and I agree with plaintiffs that the 50-80% waiting lists are relevant Horner Redevelopment documents to which they are entitled). Of course, boycotts don't help matters either. Defendants say that they are now at an impasse and ask me to allow them to proceed with the TSC without the HRC. This I will not do. Plaintiffs are reviewing the documents to

7

determine if they have a substantive objection, and I expect them to consider CHA and PM One's proposed change in procedure with an open mind.

5.   Approving "Split" Families

In the halcyon days (according to plaintiffs) before PM One, CHA, the HRC and the management company worked together in deciding whether a Horner family member could qualify for a "split" and receive housing of his or her own. Now, plaintiffs say CHA is unilaterally making split family decisions and PM One is harassing or evicting people who don't qualify. Defendants say they have discretion according to ¶ 17 of the Amended Consent Decree and are not required to cooperate with plaintiffs.

Again, I have no quarrel with the substance of particular "splits," and would likely defer to PM One and CHA's management decisions. However, I find it odd that they would fail to consult with plaintiffs on such an issue. Consulting and attempting to agree does not require a lengthy process, and I suspect much could be accomplished by dialog and negotiation prior to decision without wasting time and effort. It may be that defendants feel that plaintiffs would be obstructionist and dilatory in reaching agreement, but in such an event, I am unlikely to tolerate such behavior. As this opinion should make clear, I expect defendants to consult and negotiate with plaintiffs, I expect plaintiffs to negotiate in turn, and I expect intransigence from no one.

6.   HQS Inspections

Federal regulations require CHA to conduct annual inspections, and plaintiffs complain that PM One is conducting repeated housekeeping inspections (HQS Inspections) without consulting them. Defendants' position is quite simple: the previous manager fell behind in annual inspections so PM One inherited a backlog. After working through that backlog, PM One had to start in on its annual inspections, the result being some inspections occurring more than once in a calendar year. Plaintiffs

8

don't find this particularly objectionable, they just wish they were asked ahead of time. So, like many of the grievances presently before me, the problem is a justified concern that plaintiffs' counsel is being left out of the process, not so much an objection to the substantive management policy itself. If defendants' desire to inspect were supported by a reasonable basis, I take it plaintiffs' counsel would not advise its clients to withhold consent to inspections simply to be obstructionist. I suspect the parties will be able to agree on a resolution of this issue after some brief discussion.

7. **The Towing Policy**

PM One started a new towing policy without negotiating first. I agree with plaintiffs that towing neighborhood cars is a management policy on which they are entitled to consultation. Defendants fear that this is the road to micromanagement by the HRC. I understand the fear; the danger lies in the power the HRC has to withhold agreement or unreasonably draw out negotiations. But this it cannot do, for it would expose it to the very contempt sanction it seeks against defendants. As for the towing policy in particular, plaintiffs would have liked to see better remedies available for wrongful tows, but since they were largely excluded from the process, they were unable to successfully push for such provisions. The merits of particular remedies (lost wages, for example) are not so overwhelming that the towing policy needs to be scrapped at this juncture. Stubborn emails aside, I am now reasonably confident that defendants are willing to listen to plaintiffs concerns about guest permits, driveway parking and the like, and reach some peaceful accord.

8. **Conducting Joint Walk-Down Inspections of the Horner Mid-Rises**

A recent "surprise" survey of the Horner Mid-Rises slated for demolition (which still house some 180 families) by the plaintiffs revealed numerous problems. Defendants did not want to conduct such an inspection because the HRC inspector found few problems back in February, 2001. Defendants felt that it was too soon for another one. Plaintiffs felt otherwise and produced the report

9

highlighting a deterioration since February. Defendants respond by accusing the engineer of bias and shrugging their collective shoulders since the buildings are going to be demolished anyway. This is an insufficient response. However, since the merits of this issue have largely been developed during the course of briefing the motion (hence the parties' sur-replies and sur-sur-replies), I think it best to allow the parties to consult some more. Defendants should be aware that they cannot allow the Mid-Rises to fall apart simply because they are going to be demolished eventually (particularly as long as families live there); I reject such an argument.

In general, plaintiffs want more face-to-face meetings with PM One. Defendants say they exchange enough paper already. If that is the case, and the present motion is an indication of the state of the relationship, I encourage the parties to meet face-to-face more often. Clearly, emails and letters have not worked. As should be clear by now, I believe most of the above disputes could have been resolved without litigating a motion, and I expect they will be resolved without an order of contempt having to issue.

9. **The Home Visitor Program**

The most serious dispute between the parties concerns the Home Visitor Program, a service connector program designed to assist Horner residents in finding social service programs and to monitor their participation and success in such programs. Both sides agree that social service connection is an important facet of the Horner Redevelopment. The parties have been trying to agree on implementation of the Home Visitor Program since 1999, but are stuck. Defendant spends much of its brief touting the HVP's promise, and plaintiffs rail against the prospect of having HVP imposed without their prior consent. The real sticking point however, is whether HVP will be mandatory or voluntary. Defendants appear to concede that HVP will be voluntary. Plaintiffs remain concerned that the proposed language contains some "shall's," and they would prefer the service connector program

10

be run by Macy-Newberry Association, not Near West Community Development. Plaintiffs say Near West has a conflict of interest by virtue of its relationship with CHA Commissioner Earnest Gates. Defendants say there is no conflict. I do not need to decide that question (although it should be clear to defendants that I would not sanction a contract that the City could not enter). The parties should continue talking. If they can agree on appropriate voluntary language and agree that residents will have information available to them to find other social service connectors or providers, then my intervention will be unnecessary.[2]

I am troubled by PM One's apparent exclusion of the plaintiffs from important management decisions. However, it seems the purpose of the motion, to coerce compliance from defendants, has been achieved to some degree, and now the parties are in a position to discuss (face-to-face perhaps) the narrowing divide between them. Defendants should now know that management policies, as understood in ¶ 16 of the Amended Consent Decree, include all the issues raised in plaintiffs' motion, and I expect PM One and CHA to include the HRC and plaintiffs' counsel in the decisionmaking process, not to announce policy as a *fait accompli*. In turn, I expect the HRC not to withhold consent unnecessarily, to respond rapidly, and to negotiate in good faith with an eye toward progress, not gamesmanship. The HRC should be willing to concede on reasonable management decisions. Just because PM One is different does not make it objectionable. Of the issues before me, I believe the parties still have room to talk and resolve their differences by agreement. In the event agreement cannot be reached, any party may bring an appropriate motion upon which I will rule.

---

[2] Defendants may also want to consider whether using a Horner unit slated for a 50-80% family for HVP offices is really the best use of that space.

11

## Conclusion

CHA's motion to implement [284-1, 284-2, 284-3] is denied; Plaintiffs' motion for contempt and injunctive relief [282-1, 282-2] is denied.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: AUG 3 0 2001