UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY HORNER MOTHERS GUILD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE CHICAGO HOUSING AUTHORITY (CHA), an Illinois Municipal Corporation, et al., <br><br> Defendants. | No. 91 C 3316 <br><br> Judge James B. Zagel |

## **MEMORANDUM OPINION AND ORDER**

On September 1, 1995, I approved an Amended Consent Decree ("the Decree") binding Defendants, the Chicago Housing Authority et al., and Plaintiffs Henry Horner Mothers Guild et al., to the terms set forth therein. Paragraph 16 of the Decree mandates that the Chicago Housing Authority ("CHA") must confer with the Horner Residents Committee's ("HRC")[1] attempt to agree on the selection of a new management entity. The Decree grants this Court the authority to resolve any disputes arising out of failures to perform under this Paragraph. The Decree states :

> The CHA defendants and the development manager shall consult and attempt to agree with the plaintiffs and the Horner LAC. . . in determining the identity of the entities who will develop and manage the revitalized Horner development . . . no management plan (other than occupancy standards and tenant selection procedures . . .) or security plan [shall be] adopted, unless the CHA defendants first agree with the HRC [Horner Residents Committee]. The CHA defendants and development manager shall provide the HRC with access to all site plans, surveys, architectural drawings, Requests for Proposals ("RFPs"), proposal materials, financial information and other documents received, compiled or maintained by the CHA or development manager in conjunction with the Horner Revitalization

---

[1] The HRC was formed in compliance with the Decree and consists of no more than seven Horner Local Advisory Council members designated by Plaintiffs and the Horner LAC.

> Program.  Notwithstanding the foregoing, the HRC, on behalf of the plaintiffs, shall not unreasonably withhold its consent. . .any disputes concerning the HRC's performance under this Paragraph or any relief to be granted due to the HRC's failure to perform under this Paragraph shall be resolved by the Court.

CHA has recently initiated a search for new management, and Plaintiffs allege that CHA's actions are in violation of Paragraph 16 of the Decree.  CHA now moves for this Court to approve a contract with H.J. Russell & Co. as property manager for Phase I of the Henry Horner Development, or in the alternative, require the HRC to consult with CHA on the selection of a property manager for the Horner Phase I Portion of the development from a pre-selected group of four firms.  Plaintiffs object arguing that CHA has violated the terms of Paragraph 16 by excluding the HRC from the selection process, and states that CHA must issue a new procurement for the management of the Phase I Horner development.  For the foregoing reasons, I grant in part, and deny in part, the CHA's motion.

## I. BACKGROUND

The Henry Horner Development is a housing development that consists of two "phases."  Phase I contains 461 public housing units plus 90 public housing units located in the Annex.  Phase II consists of mixed-income housing with 744 units, including 258 public housing units.  Phase II is still under development.  All of the Phase I units are for public housing families and are owned by CHA.  As owner, CHA contracts for the management of the Phase I units.

Prior to 2009, CHA had fourteen different property management firms involved in managing its traditional family public housing developments such as Horner's Phase I.  CHA's traditional family public housing developments include seventeen different developments and 11,182 units of housing.  Additionally, CHA had twenty four property management firms

managing senior, scattered-site, family and other mixed-income units. CHA determined that utilizing numerous management firms was inefficient and costly and therefore, on February 10, 2009, it initiated a nationwide RFP to reduce the cost of management by lowering the number of property management firms involved in the management of the traditional family public housing developments to five or less. Addenda were issued in March and April of 2009.

Prior to the issuance of the RFP, in September of 2008, CHA announced to the Central Advisory Council ("CAC"), which included Horner Local Advisory Council ("LAC") President and HRC member Crystal Palmer, its desire to reduce the number of management firms and to "bid out all management work." Each month, CHA staff briefed CAC on the progress of the management search, however, Plaintiffs assert that these talks were exclusively with CAC President Dverra Beverly and CHA counsel Robert Whitfield – not with Ms. Palmer.

The solicitation was national in scope and the RFP sought bids for the entire portfolio of CHA housing, "or at least all of the units in one or more of the four categories or portfolios of housing. . . ." No RFP was issued for Horner Phase I specifically, nor was a firm able to bid solely on Horner Phase I. In fact, Horner Phase I "represented less than 5% of the 11,182 traditional public housing units, and only 2.3% of all 23,141 public housing units for which management was sought in the RFP."

On February 19, 2009 and March 13, 2009 CHA conducted pre-proposal conferences with prospective bidders and did not include the HRC in these conferences. Additionally, on February 24, 25, and 26, Plaintiffs allege that CHA conducted a bus tour of the properties included in the RFP, including Horner, but did not notify the HRC about the occurrence of these tours.

On April 10, 2009 CHA received fourteen[2] bids for its traditional family units, and the bids were reviewed by an evaluation committee.[3] The committee consisted not only of CHA officials, but also individuals elected by each CHA development's Local Advisory Council to ensure that residents had input into the selection panel. The members of the evaluation committee examined and rated each proposal, and the firms receiving the highest four[4] ratings for the traditional family housing, in order, were: (1) H.J. Russell; (2) the Habitat Co.; (3) the Woodlawn Community Development Corp.; and (4) East Lake Management. Plaintiffs allege that HRC was excluded from this process and was therefore never able to evaluate the merits of any proposal.

On July 9, 2009 CHA Assistant General Counsel orally informed Horner class counsel about the RFPs and asked HRC to "negotiate" with CHA over the finalists selected by CHA. CHA counsel delivered RFP documents to Plaintiffs' counsel's office on July 28, 2009 and asked that HRC make a selection by August 6, 2009. HRC met on August 5, 2009 to consider the issue and decided to "respectfully decline to select a Horner Phase I property manager from the list of

---

[2] A total of twenty-four proposals were received by CHA including fourteen traditional family housing bids, as well as bids for scattered-site, senior and other groups of CHA-owned mixed-income housing.

[3] The committee was composed of Tim Veenstra, CHA Senior Vice-President of Asset Management; Eli Rosario, CHA's Chief Financial Officer; Jarrie Brown, CHA's Director of Quality Assurance; Deveera Beverly, the president of the Central Advisory Council (composed of the resident-elected presidents of each CHA development's LAC, including Horner's); and Robert Whitfield, the attorney for the CAC.

[4] The original group of twenty-four proposals was reduced to five finalists for all CHA-owned property, the senior, scattered-site and CHA owned mixed-income units. The CHA authorized contract negotiations with four finalists for the traditional family housing developments.

finalists CHA had selected" because, in their view, CHA's "procurement had violated Paragraph 16 of the Amended Consent Decree."

Plaintiffs assert that the HRC was improperly excluded from the Phase I management selection process, but note that CHA informed the HRC, through HRC member Crystal Palmer, of the RFP plan on three occasions. Plaintiffs acknowledge that in September 2008 ,CHA announced to the CAC, which included Horner LAC President and HRC member Ms. Palmer, its desire to reduce the number of management firms and to "bid out all management work." Next, in June 2009 Ms. Palmer and Charles Hillman (Charles Hillman is the Senior Vice-President for Asset Management, Family Portfolio) encountered each other at CHA's main office. At this time, Mr. Hillman informed Ms. Palmer that he wanted her assistance regarding the RFP for Phase I management. Upon learning of the RFP, Ms. Palmer stated that CHA needed to "immediately involve" the HRC in the process, and Mr. Hillman assured Ms. Palmer that HRC would be included. Finally, on September 17, 2009, Ms. Palmer, Mr. Hillman and Ms. Jadine Chou (of CHA's Asset Management Division) met to discuss CHA's obligations to HRC following CHA's filing of this motion with this Court.

On October 7, 2009 the HRC met with CHA officials to discuss this matter, but were unable to reach an agreement because CHA insisted on the HRC selecting a management firm from its preselected group of four firms.

## II. DISCUSSION

The current dispute illustrates a stalemate between CHA and HRC. Both CHA and HRC acknowledge that, before a new management firm can be selected, CHA and HRC must consult and attempt to agree on this new entity. The dispute at hand turns on whether or not CHA

violated Paragraph 16 when it solicited RFPs, and narrowed its list of potential new management firms down to four, without the consultation or input of the HRC.

CHA insists that it did not violate Paragraph 16 of the Decree and argues that Paragraph 16 does not give HRC a right to "participate in all aspects of a CHA procurement, particularly where it is an Authority-wide procurement." CHA does not believe that Paragraph 16 requires it to "develop its RFPs with the HRC, include HRC at its pre-proposal conferences with bidders, or run RFP addenda by the HRC for its agreement." Furthermore, CHA asserts that Paragraph 16 requires only that CHA provide HRC with its RFPs and responsive materials from its four finalist firms which it has already done.[5] CHA points out that this dispute is unique because it involves an Authority-wide procurement consisting of only a portion of the Horner development. CHA highlights that it "would be more than a bit awkward" for Horner residents to participate in the citywide bid solicitation process when residents of other developments had no such right of participation. CHA maintains that it has not violated Paragraph 16 of the Decree and asserts that it is not "reasonable or practical to re-bid the work at Horner" alleging that it would cost a minimum of $150,000 and that it would be an additional six months before a new manager is able to take over Horner."[6] Furthermore, CHA argues that the re-bid suggested by Plaintiffs "would not secure more or different firms." To support this contention, CHA asserts that an RFP for Horner Phase I units (of which there are 551 public housing units) would be less attractive to

---

[5] CHA provided counsel for the Horner plaintiffs and the HRC copies of the Horner RFP and its addenda and all material submitted in response to the RFP and thereafter by the four finalists. Additionally, CHA submitted the responses of Legum & Norman, a firm which was not chosen as a finalist.

[6] CHA notes that it is in the best interests of Horner not to have the current manager on-site for an extended period of time because "lame duck managers do not generally perform well."

management firms than the RFP previously offered that included 11,182 traditional family public housing units and thousands more CHA units in a variety of portfolios. CHA also argues that an RFP for Horner alone is unworkable in light of CHA's goal of consolidating management.

Plaintiffs allege that CHA has violated its Paragraph 16 obligation in seven specific ways: (1) on February 10, 2009, when CHA issued an RFP for property management services that included Phase I of the Horner development without any input from HRC; (2) on February 19, 2009 and March 13, 2009, when CHA conducted pre-proposal conferences with prospective bidders; (3) on February 24, 25, and 26, 2009 when CHA conducted a bus tour of the properties involved in the RFP;[7] (4) on March 9, March 23, and April 1, 2009 when CHA issued addenda to the RFP without notice or consultation of HRC; (5) on or after April 10, 2009 when CHA set the competitive range for each property; (6) after April 10, 2009 when CHA had nine firms make oral presentation of their best and final offers, failed to invite the HRC; and (7) on July 15, 2009 when CHA selected five firms as finalists without input from the HRC.

Plaintiffs argue that the Decree does not make an exception for Authority-wide procurements, and adds that if it did, CHA could avoid its obligation to HRC by issuing only Authority-wide procurements that include Horner. Plaintiffs assert that the plain language of the Decree requires the CHA to consult with the HRC on the selection of the Horner management and that the HRC should have been involved in all aspects of the selection process beginning with the RFP. Additionally, Plaintiffs are unmoved by CHA's contention that re-bidding will be a costly and time-consuming process. Plaintiffs argue that CHA is in this position only because

---

[7] Although there is a discrepancy regarding when this bus tour took place and who was invited, the result of this discussion does not influence the outcome of this decision.

7

it failed to comply with Paragraph 16 and that the resulting consequences of its non-compliance were not unforeseen. Accordingly, Plaintiffs ask that CHA issue a new procurement for Phase I Horner and involve the HRC in all aspects of the procurement.

> I. The CHA Asks This Court to Approve H.J. Russell & Co. as Property Manager for Phase I of the Henry Horner Development.

CHA asks this Court to approve its decision to hire H.J. Russell & Co. ("H.J. Russell") as the new property manager for Phase I of the Henry Horner Development.[8] In support of its decision, CHA states that H.J. Russell received the highest overall marks from CHA and resident representatives, has excellent experience in managing similar housing, and is part of a national property management firm with many resources. Despite CHA's positive review of H.J. Russell, the HRC has serious concerns regarding the suitability of H.J. Russell's management firm. These concerns stem from a recent citation H.J. Russell received in Florida regarding allegedly mismanaged work.

Clearly, there is a disagreement about the suitability of H.J. Russell as a management firm for Horner Phase I. Furthermore, as evidenced by the filing of this motion, CHA and HRC have not yet truly consulted on the issue of an appropriate management firm because of the current dispute over the proper procedure for procuring a new management entity. Paragraph 16 states that no management entity should be selected without consultation and an attempted agreement between CHA and the HRC. As there is no agreement here between these parties regarding H.J. Russell, and because there has not been adequate consultation between CHA and the HRC to explore all possible management firms, I decline to force this management firm upon the Horner

---

[8] Despite the fact that H.J. Russell is CHA's top pick, CHA stated in this motion that it "is not wedded to H.J. Russell and would be happy to discuss others with the HRC. . .".

Phase I development. I therefore deny the CHA's motion to approve H.J. Russell as the new management firm of the Horner Phase I development.

## II. The CHA Asks This Court to Require the HRC to Consult with the CHA on the Selection of a Property Manager

Having denied the CHA's motion to approve its first choice of management firm, H.J. Russell, I now address the issue of whether or not CHA's procurement actions violated Paragraph 16 of the Decree thereby warranting a new procurement for Horner Phase I.

CHA argues that Paragraph 16 does not require the HRC's involvement in an Authority-wide procurement for new management firms and contends that by providing a list of four approved management firms, as well as accompanying documentation, such as the RFP, the Addenda and materials submitted by the four finalists, it has fulfilled its Paragraph 16 obligations.[9] Plaintiffs argue that the Decree does not make an exception for Authority-wide procurements and add that the plain language of the Consent Decree requires the CHA to consult with the HRC on the selection of the Horner management. Accordingly, Plaintiffs assert that the HRC should have been involved in all aspects of the selection process beginning with the issuance of the RFP. Plaintiffs now request that CHA issue a new procurement for Phase I Horner.

CHA and the HRC are correct that Paragraph 16 of the Decree does not address the instance of an Authority-wide procurement. Instead, it speaks generally to the determination of those who will manage the Horner development and requires the CHA to provide the HRC with "access to all site plans, surveys, architectural drawings, Requests for Proposals ( "RFPs"),

---

[9] CHA states that the HRC did not express interest in reviewing documents submitted by The Habitat Co., and therefore these materials were not sent to them.

proposal materials, financial information and other documents received, compiled or maintained by the CHA or development manager in conjunction with the Horner Revitalization Program." Indeed, CHA is not released from its Paragraph 16 obligations depending on whether or not a procurement was Authority-wide. However, I do not find, as asserted by Plaintiffs, that the plain language of the Decree requires the HRC to be involved in every step of the procurement process.

The Decree does not require Horner's procurement to be handled separately from the rest of the Authority. Instead, Paragraph 16 requires that "CHA defendants and development manager shall provide the HRC with access to all site plans, surveys, architectural drawings, Requests for Proposals ("RFPs"), proposal materials, financial information and other documents received, compiled or maintained by the CHA or development manager in conjunction with the Horner Revitalization Program." This statement speaks to the level of participation this Court envisioned the HRC to have in the RFP process; it does not confer full procurement participation rights on the HRC.

CHA is required to share documentation with the HRC and consult with the HRC prior to making a decision regarding new management. CHA is not required to include HRC in the drafting of the RFP or in the initial selection and screening of management firms. I find that CHA fulfilled its Paragraph 16 obligations with respect to its RFP and declined to order a new RFP procurement for Horner Phase I. I do however, find that CHA violated its Paragraph 16 obligation with respect to its document production to the HRC. In accordance with the Decree, CHA should have provided the HRC with materials received from all fourteen firms bidding on CHA's traditional housing units, not merely the four top firms.

In my previous Order in this case, I held that Paragraph 16 requires ". . . more than post hoc notice of changes in management policies. It requires consultation and an attempt to agree before implementation." *Henry Horner Mothers Guild et al. v. Chicago Housing Authority*, No. 91-cv-03316, 2001 WL 1002464, at *2 (N.D. Ill. Aug. 31, 2001). Under the Decree, CHA is obligated to "include the HRC and plaintiffs' counsel in the decisionmaking process, not to announce policy as a *fait accompli.*" *Id* at *7. Here, I do not find that CHA provided only post hoc notice of changes. CHA announced its intention to reduce the cost of management in September of 2008, at which point the HRC was put on notice through member Crystal Palmer. Furthermore, CHA has not imposed any management firm upon Horner Phase I. Instead, it has proposed four firms for the consideration of the HRC which has already been through a preliminary screening process. Additionally, CHA explains in its reply brief to this motion that it is willing to consider firms outside the list of four that the HRC might put forward for consideration.[10]

At the heart of Paragraph 16 is the obligation to work together to reach a mutually agreeable solution. I acknowledge that the HRC has concerns about all four finalists. HRC specifically notes that finalist H.J. Russell received a citation in Florida, and that a second finalist, the firm of East Lake Management, allegedly had previously been considered an undesirable firm to manage Phase I Horner.[11] The Decree dictates that CHA and the HRC must attempt to agree on the selection of a new management entity. CHA has presented four

---

[10] CHA states in its reply brief that if "the HRC wishes to offer a different firm than one of these four, then so be it."

[11] Plaintiffs do not explain why or when this firm was previously considered an undesirable choice for the Horner Phase I development.

management firms to the HRC, and has now offered to consider firms outside the scope of these four finalists. The HRC is well within its rights to evaluate each firm presented by the CHA and determine which firm is the best fit.

I hereby order CHA and HRC to have meaningful consultation and discussion regarding the selection of management firms. CHA and HRC should begin discussions with the four top-ranked firms selected by CHA. These four firms were selected not only by CHA representatives, but also with input by Deveera Beverly who represented the resident-elected presidents of each CHA development's LAC. If CHA and HRC are unable to agree on any firm within this group of four, then CHA and HRC should consider remaining firms within the fourteen submitted bids.

It is in both CHA and HRC's best interest to select a mutually agreeable management firm for Horner Phase I that conforms with CHA's larger goal of reducing cost and reflects the thoughts and concerns of the evaluation committee composed of individuals elected by each CHA development's LAC. As I stated in my earlier Order, "I expect HRC not to withhold consent unnecessarily. . . and to negotiate in good faith with an eye toward progress. . ." In turn, I expect CHA to seriously consider HRC's concerns regarding the selection of a new management firm and work to ensure that each concern is addressed and that a mutually agreeable solution is reached.

**CONCLUSION**

For the foregoing reasons, the CHA's motion is granted in part and denied in part. I deny CHA's motion to approve CHA's contract with H.J. Russell & Co. as property manager for Phase I of the Henry Horner Development. I grant CHA's motion to require the HRC to consult with the CHA on the selection of a property manager for the Horner Phase I portion of the development.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: November 20, 2009