UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY HORNER MOTHERS GUILD, et al., | |
| Plaintiffs, | No. 91 C 3316 |
| v. | Judge James B. Zagel |
| THE CHICAGO HOUSING AUTHORITY (CHA), an Illinois Municipal Corporation, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

On December 17, 2009, Plaintiffs filed a motion for declaratory and injunctive relief asking that I (1) declare that the Chicago Housing Authority's ("CHA") policy of denying Horner class members "family splits" to relieve overcrowding violates Paragraph 17 of the Horner Amended Consent Decree, (2) enjoin CHA from enforcing its "family split policy" as expressed in Section 4.7.A of CHA's *Admissions and Occupancy Policy for West Haven Park II B Rental and Subsequent Phases* ("AOP") against Horner Phase II class members, and (3) require CHA to grant family split requests of four individual Horner class members. Plaintiffs allege that CHA has violated Paragraph 17 by denying two Phase I families and two Phase II families their family split requests. Defendants oppose Plaintiffs' motion and argue that Plaintiffs have not been denied any right and that the CHA solution is the most efficient and equitable to the presented issue of overcrowding.

## I. BACKGROUND

On September 1, 1995, I approved an Amended Consent Decree ("Decree") binding Defendants, the Chicago Housing Authority et al., and Plaintiffs Henry Horner Mothers Guild et

al., to the terms set forth therein. That Decree identified 933 families who lived at the development in April 1995. The goal of the Decree was to convert the Horner development from a hazardous low-income housing development to a mixed-income neighborhood consisting of new and renovated mid-rise and low-income, low-density homes. As part of that process, the Horner families were given their choice of replacement housing. Residents selected new units on the site of the old Horner project, new units built in the Horner neighborhood, and rehabilitated units at the Horner Annex, and scattered-site units throughout the city. Others selected section 8 vouchers providing subsidized units in existing buildings in the city and suburbs. As of 2008, all of the original Horner families had been provided their choice of new replacement housing.

The redevelopment plan built more public housing than was necessary to accommodate the original Horner families. As new public housing becomes available, CHA and its private manager fill the units with CHA families from other developments who are on the Housing Offer Process ("HOP") list. Typically HOP families have been relocated from dangerous buildings and have elected to take a temporary section 8 subsidy while they wait for the mixed-income units to be developed. These families, unlike the Horner families, have not received "replacement housing" until they can be housed at Horner.

Two of the families at issue in Plaintiffs' motion are Horner HOP list families who came to Horner from other developments (Miles and Griffin). The two other families (Bradford and Miles) are original Horner families. Plaintiffs have brought this motion because of their needs for larger units. In three of the four cases, the apartments became overcrowded when someone in the household had a new baby. Accordingly, each has requested that CHA grant them a "family

split" pursuant to paragraph 17 of the Decree. Each has requested a newly constructed Horner Phase II replacement unit.

Plaintiffs allege that CHA improperly denied the four class members' requests for family splits. In May and June, 2009, CHA denied each of the requests on the ground that Section 4.7.A of CHA's AOP does not provide for family splits, but rather requires CHA to assign the entire family to larger dwelling units within West Haven Park. All families who requested family splits have been placed on waiting lists for larger units.

Paragraph 3 of the Horner Agreed Order of February 1, 2000 allows the Horner plaintiffs to appeal decisions of CHA relating to Phase II of the Horner redevelopment to the Horner Mediator ("the Mediator"), John Schmidt, with review of the Mediator's ruling to this Court if requested by any party. On June 17, 2009, the Horner plaintiffs appealed CHA's decision to deny family splits to four Horner class members to the Mediator. The Mediator reviewed CHA's decisions to "determine reasonableness under all facts and circumstances." On December 7, 2009 the Mediator found that although it would "be desirable to make the moves to larger units faster than may be possible in all cases, the delay does not seem to me to make the CHA's decisions unreasonable." Denying family splits would also increase the availability of new Horner housing to a larger number of low-income tenants which is consistent with the purpose of the Decree. Horner plaintiffs Demetria Miles, Sheena Griffin, Odell Bradford, and Joanne Harris now appeal the Mediator's decision to this Court.

**A. Demetria Miles**

The Miles family moved into a new 3-bedroom unit in Phase II of the Horner development on February 1, 2008. In early 2009, after the birth of a child, the family became

3

eligible for a 4-bedroom unit. Plaintiffs propose that Ms. Miles and her son be "split off" and moved to a new 2-bedroom unit at Horner while the remaining family stay in the family's current 3-bedroom unit. CHA proposes that the Miles family be placed on the waiting list for a 4-bedroom apartment.

### B. Sheena Griffin

Ms. Griffin and her family moved into a new Phase II 4-bedroom unit at Horner on June 11, 2008. After moving in, one family member gave birth to a new child. Ms. Griffin now seeks a split to provide a new 2-bedroom unit for the mother and child. All parties agree that the Griffin family qualifies for a 5-bedroom apartment under the federal and CHA Occupancy guidelines. Again, CHA argues that instead of providing a split, the Griffin family should be placed on a waiting list for a 5-bedroom unit.

### C. Odell Bradford

Odell Bradford, his daughter, and two grandchildren live in a 2-bedroom unit and are eligible for a 3-bedroom unit. CHA argues that the Bradford family should be placed on the 3-bedroom waiting list, whereas Mr. Bradford has requested a family split.

### D. Joanne Harris

Ms. Harris presents a situation where, unlike the other Plaintiffs, the CHA does not believe she is entitled to a larger unit. Ms. Harris lives with her daughter and her granddaughter. Ms. Harris has requested to have her own new unit so that her daughter and child can have a 2-bedroom apartment. She contends that once the granddaughter turned 6 years old, the daughter is entitled to her own bedroom, thus making the family overcrowded.

## II. STANDARD OF REVIEW

Paragraph 30 of the Decree provides that this Court "retain jurisdiction of this matter for the purpose of enabling any party to this proceeding. . . to apply to this Court for such further orders as may be necessary or appropriate for the construction, implementation and enforcement of this Amended Consent Decree." The Agreed Order of February 1, 2000 provides in Paragraph 3 that if CHA and the plaintiffs are unable to agree "after a recommended resolution by the Mediator, any party may appeal the Mediator's recommended resolution to this Court."

The CHA argues that the Mediator's decision is entitled to deference because the Mediator "gave the parties every opportunity to present their views on this issue and he carefully considered all of the facets of the question presented." Furthermore, CHA argues that the Mediator has a special expertise with respect to the Horner development. Finally, CHA argues that the Mediator is entitled to deference because Plaintiffs' motion does not present a legal issue, but rather competing views on how a particular occupancy issue should be addressed.

Plaintiffs note however that the Mediator has no binding authority. Indeed, the Mediator himself has conceded this point. I agree that I am not bound by the Mediator's prior decision, nor do I owe any special deference to his decision. This case presents not only a practical issue as the CHA suggests, but also competing views on Court-issued Decrees. Furthermore, as noted in the Agreed Order, either party may appeal the decision of the Mediator to this Court and pursuant to Paragraph 30, I retain jurisdiction over this matter.

### III. DISCUSSION

Plaintiffs contend that CHA has adopted a policy of denying Horner class members requests for family splits. In the cases of Miles, Griffin and Bradford, the CHA agrees that the families are currently overcrowded in their present units. The dispute regarding these three

5

families revolves around the proper solution to their overcrowding. Plaintiffs argue that CHA must grant their requests for a family split, whereas the CHA argues that the families can be properly placed on a waiting list for a larger single family unit. Regarding Harris, the CHA denies that the unit is overcrowded and that the family is entitled to relief. CHA further denies having a policy of denying family splits.

Plaintiffs argue that Paragraph 17 of the Amended Consent Decree allows Horner families eligible for family splits to select their choice of new replacement housing and that CHA and the Mediator both improperly denied their requests for new units. Plaintiffs further argue that it is unreasonable to require these families to remain in their current overcrowded conditions for what could be years when newly constructed Phase II housing will be ready in May 2010. Plaintiffs contend without the splits these families will remain on waiting lists for years before receiving larger housing.

CHA argues that they have no obligation to provide these four Horner families split housing. Instead, CHA contends that its solution is consistent with Paragraph 17 of the Decree because it provides for the best utilization of Horner's resources, is fair to families most in need and gives expanding families larger units. Rather than requiring splits, CHA argues that Paragraph 17 permits a family split. Further, Defendants argue that Paragraph 17 vests discretion in the CHA to determine whether a split will be permitted. Finally, CHA disputes that waiting times will necessarily be years and adds that Horner families on the 'transfer list' have top priority for new units.

**A. Defendants Do Not Have a Policy of Denying Horner Plaintiffs Family Splits**

Plaintiffs contend that CHA has adopted a blanket policy of denying Horner plaintiffs family splits on grounds that Section 4.7.A of CHA's AOP does not provide for splits, but rather requires the CHA to assign entire families to a larger dwelling. Accordingly, this contravenes Paragraph 17 of the Decree.

CHA admits the AOP is subject to the Horner Amended Consent Decree. However, CHA argues that because it is not required to grant split requests by Paragraph 17, it must exercise its discretion. When exercising its discretion, one factor the CHA considers is its policy in other mixed-income developments. CHA argues that Section 4.7.A of the AOP reflects a policy of transferring families to larger units rather than splitting one family in two units. It further concedes that in certain circumstances splits are warranted. For example, in cases of inordinate delay in receiving a transfer, emergency situations, or a complete unavailability of an appropriately sized apartment (a 6-bedroom unit does not exist), a family will be split. CHA argues that because none of these circumstances exist here, and in consideration of CHA policy, a split is not appropriate. In accordance with CHA's stated policy, the CHA has opted to make new units at Horner available to the Horner HOP list and place the four Plaintiffs on waiting lists for larger units. The CHA argues that this is the most efficient use of its resources because by maintaining a one-family/one-unit ratio, it is able to most efficiently utilize its housing resources.

I do not find that CHA has a <u>blanket</u> policy against family splits. There is clearly a preference for denying such splits, but as the mediator noted, and I agree, its policy is reasonable under ordinary circumstances and consistent with the goals embodied in the Decree. CHA admitted that it has granted family splits in the past and articulated circumstances in which splits

are granted. Furthermore, I do not find that a reading of Section 4.7.A prohibits family splits. Section 4.7.A states:

> If, upon re-examination, it is found that the size or composition of a family or household has changed so that the unit occupied by the family contains a number of rooms greater than necessary to provide decent, safe, and sanitary accommodations, in accordance with federal guidance and CHA policies, management shall, if possible, reassign or transfer residents to other dwelling units within Westhaven Park.

While CTA argues that 4.7.A reflects a policy against assigning splits, I note that 4.7.A calls for a reassignment or transfer of "residents" to new units. Although CTA contends that "family" and "residents" is interchangeable, therefore supporting a policy of transferring family units as a whole, a second view could interpret "residents" as individual family members, and therefore allow family splits. Regardless, because the AOP does not supercede the Consent Decree, Section 4.7.A does not control my decision in this case.

**B. Paragraph 17 of the Amended Consent Decree Does Not Guarantee Family Splits**

Plaintiffs argue that Paragraph 17 of the Amended Consent Decree requires CHA to grant Horner families eligible for family splits their choice of replacement housing. Paragraph 17 of the Horner Amended Decree states in relevant part :

> Where necessary to accommodate family housing needs, CHA and the Horner plaintiffs may agree to allow household members with children of their own to convert to principal leaseholder status and thereby obtain their own Horner Housing Certificate; provided that the Horner plaintiffs may petition the Court to authorize such conversions if CHA and the Horner plaintiffs are unable to agree.

A reading of Paragraph 17 imposes no affirmative duty upon CHA to grant family split requests. The Decree provides that the CHA and Horner plaintiffs "may agree to allow" family splits and further provides a right for Horner plaintiffs to petition the court to authorize a split if

8

CHA and Horner plaintiffs are unable to agree. This is precisely the situation I am presented with. The language of Paragraph 17 is clear that the right to a split is not absolute, but subject to agreement between CHA and Horner plaintiffs and is subject to an appeal. Accordingly, CHA did not explicitly violate any provision of the Consent Decree. As Plaintiffs are guaranteed a right of appeal from both the decision of the CHA and the Mediator, I will review each Plaintiff's request for a family split in light of the facts presented to me. Neither prior CHA nor Mediator decisions are binding on my ruling.

I note that the CHA is faced with the difficult task of balancing the needs of many low-income families throughout the City of Chicago. In balancing these needs, it is faced with deciding orders of priority. The essential question I am presented with is whether these four families should be allowed to immediately, or very shortly, occupy two Horner units at the expense of other waiting families. If these four residents are allowed to split, their crowding will be alleviated, while another family will be forced to continue to wait for a new unit to become available. If not allowed to split, these residents will continue to live in overcrowded conditions, while a family on the waiting list will move into new housing.

      1. <u>Demetria Miles</u>

The Miles family was not an original resident of Horner, but instead came to Horner from the Horner HOP list on February 1, 2008. There is no dispute that the Miles' residence is currently overcrowded, and the family is eligible to move to a 4-bedroom unit. Plaintiffs propose that Miles and her son be "split off" and moved to a new 2-bedroom unit at Horner while the remaining family stay in the family's current 3-bedroom unit. CHA proposes that the Miles family be placed on the waiting list for a 4-bedroom apartment.

9

CHA denied Miles' request for a family split and argued that while there is a vacant 2-bedroom unit available, it is scheduled to be leased to another family who is first on the Horner HOP list. CHA argued that granting Miles' request would inflict hardship on the Horner HOP family waiting for a 2-bedroom unit. This family has been waiting for seven years for such a unit to become available.

In CHA's response to this motion, it stated that a new 4-bedroom unit would become available for the Miles family as of March 5, 2010. In light of this fact, it seems reasonable to deny the Miles' family request for a split unit as there is a readily identifiable new unit available for them to move into. This solution comports with both the stated goals of CHA, to make the revitalized Horner residence a "new and renovated mid-rise and low-rise, low density" housing location and to provide housing to the greatest number of families, and the goal of the Miles family which is to find relief from their overcrowded unit.

As a new unit has been readily identified as available for the Miles family in March 2010, I deny the Miles family's request for a family split.

### 2. Sheena Griffin

Griffin and her family are not original Horner residents and moved into a new Phase II 4-bedroom unit at Horner on June 11, 2008. There is no dispute that the Griffin family now qualifies for a 5-bedroom unit. Again, CHA argues that instead of providing a split, the Griffin family should be placed on the waiting list for a 5-bedroom unit. CHA denied Ms. Griffin's request because it would displace another family that has been waiting for a replacement unit. As there are no 5-bedroom units at Phase II Horner, CHA has offered to place the Griffin family on the waiting list for a 5-bedroom unit at Phase I Horner.

In its response, CHA admits that Griffin's situation is "more difficult" as 5-bedroom apartments are "hard[] to come by." CHA states that there are three vacant 5-bedroom units at Horner; however, due to damage by prior tenants they are undergoing repairs and are unavailable. Griffin is currently number two on the waiting list and therefore entitled to a 5-bedroom unit undergoing repair.

While CHA has not given a date for the completion of the repairs, they have conceded that if the wait for a 5-bedroom unit becomes "severely protracted," the split issue can be revisited. Griffin has asked that her daughter and granddaughter be placed in a 2-bedroom unit that is expected to become available for rent by May 2010. I find that Ms. Griffin's request for a family split should be denied as there are three 5-bedroom units being repaired. As the second person on the waiting list for these units, her wait for such a unit should be minimal. If, however, repairs on the 5-bedroom units are not completed, or substantially close to completed, by May 2010, I order that Griffin's family split request be reconsidered.

### 3. Odell Bradford

Odell Bradford, his daughter, and two grandchildren live in a Horner Phase I 2-bedroom unit. The Bradford family is an original Horner family and is eligible for a 3-bedroom unit. CHA argues that the Bradford family should be placed on the 3-bedroom waiting list. CHA denied Bradford's request for a family split for many of the aforementioned reasons. CHA noted in its response that he is currently number five on the Phase I 3-bedroom waiting list and that while there are 213 3-bedroom units in Phase I, there are none currently available.

Bradford's situation differs from that of Ms. Miles and Ms. Griffin. Not only is Bradford lower on the waiting list for a new unit, but there is no identifiable unit for his family to move into. While the CHA's goal of accommodating as many families as possible is indeed valid, it

11

must also consider its stated goal for Horner's revitalized units which is for the units to be "low-density." Additionally, the CHA acknowledges that when a unit is overcrowded, a unit suffers additional 'wear and tear.'

I therefore order that Bradford be granted his split request. I note however, that if a 3-bedroom unit becomes available for the Bradford family prior to the family's split needs being met, the family should remain intact and transfer into the larger 3-bedroom unit.

### 4. Joanne Harris

Harris presents the situation where, unlike the other Plaintiffs, the CHA does not believe she is entitled to a larger unit. Harris lives with her daughter and her granddaughter and argues that once her granddaughter turned 6 years old, she became entitled to her own bedroom, thus making the family overcrowded.

All parties agree that the Phase I Occupancy Standards apply to Ms. Harris. Section G(2) provides that "[g]enerally, two people are expected to share a bedroom." Accordingly, a 2-bedroom unit normally can accommodate four persons. There are however, limits on who can share a bedroom. The applicable restriction in this case states that "children age five and under share a bedroom with any child or parent, regardless of age or sex." From this provision, Ms. Harris argues that every six year old has a right to their own bedroom (unless there is a same sex child in the household under 17). Plaintiffs point to prior interpretations of this section where a child, once reaching the age of six, is not required to share a bedroom with his or her mother.

While it may be true that a child may not be required to share a bedroom with his or her parent, this does not necessarily entitle the child to his or her own room. The maximum number for a 2-bedroom unit is four persons. The Harris household currently consists of Ms. Harris, her daughter, and her granddaughter. I am unconvinced that Harris is eligible for a family split

12

simply based upon the age of her granddaughter. Accordingly, Harris' request for a family split is denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for declaratory and injunctive relief is granted in part and denied in part.

ENTER:

*James B. Zagel*
United States District Judge

DATE: April 5, 2010